IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

UNITED STATES OF AMERICA, §
§
Plaintiff, §
§
VS. §       Criminal No. 2:17-CR-023-D
§
JESSICA MARIE WALSH, §
§
Defendant. §

MEMORANDUM OPINION
AND ORDER

Defendant Jessica Marie Walsh ("Walsh")—who is charged with the offense of possession of fifteen or more counterfeit access devices, in violation of 18 U.S.C. § 1029(a)(3)—moves to suppress all evidence—including contraband and photographs seized in connection with the search of the vehicle Walsh was driving and statements of Walsh. Following an evidentiary hearing, and for the reasons that follow,[1] the court denies the motion.

I

On February 8, 2017 Deputy Joel Skinner ("Deputy Skinner") of the Gray County, Texas Sheriff's Office was patrolling Interstate Highway 40 in Gray County. Deputy Skinner has been a law enforcement officer for the Gray County Sheriff's Office for eight years, and has been a canine handler since May 2014. On the date of the stop, Deputy

---

[1] Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

Skinner was operating a canine unit with his canine, Lewigi.

Deputy Skinner has been working with Lewigi, a Belgian Malinois, since 2014. He trains monthly with Lewigi, either in Amarillo or with other Gray County Sheriff's Office canine handlers. Deputy Skinner also has approximately ten years' experience training drug-detecting dogs and their handlers with his father Jim Skinner, who is also a Gray County Sheriff's Office canine officer.

Lewigi was initially trained by AMK9, a private security firm in Alabama. He is trained to detect marihuana, cocaine, heroin, and methamphetamine. In addition to narcotics detection, Lewigi is also trained as a patrol dog, which means he may be used for apprehensions and building searches. Before he was donated to the Gray County Sheriff's Office, Lewigi worked for AMK9 in Afghanistan. Lewigi was four years old when he began working with Deputy Skinner. Lewigi is trained to respond to commands in Dutch.

In March 2016 Lewigi was certified by both the National Narcotic Detector Dog Association ("NNDDA") and the National Police Canine Association ("NPCA"), and he was certified again by both organizations in March 2017 (the month after Walsh's stop). The NNDDA certifications consist of building searches, and the NPCA certifications use both buildings and vehicles. Each certification required Lewigi to perform in a controlled environment using single-blind controls, i.e., tests in which the handler does not know where drugs are hidden. The NPCA certification also uses some scenarios in which no drugs are present, to test the canine's reaction to the lack of a trained odor. Lewigi has never failed a certification, and has never given a false alert (i.e., given a final response to an area lacking

any trained odors) during certification testing. In training activities outside of certification, Lewigi has given only one false alert out of 798 exercises.

Lewigi also has a history of reliability in the field. Deputy Skinner documented Lewigi's performance during training and deployments from 2014 to June 2017, with the exception of a two- or three-month period that was lost in a transition between record-keeping systems. According to these records, Deputy Skinner has deployed Lewigi in the field to conduct a free-air sniff 173 times, and Lewigi alerted 84 times. Of these 84 alerts, 75 were substantiated by the finding of drugs, and 80 were substantiated either by the finding of drugs or something else, such as a noticeable smell or residue of marihuana.

Lewigi is a passive alert dog, which means that his trained final response to detecting the odor of certain drugs is to sit. Lewigi also exhibits other odor responses to detecting drugs, such as changing his breathing and his body posture. More specifically, he closes his mouth, takes shorter deeper breaths, pins his ears back, and "detail searches" (sticks his nose closer to an area, such as a door seam). Deputy Skinner has observed Lewigi exhibiting these responses during the approximately three years they have worked together.

When Lewigi conducts a free-air sniff, Deputy Skinner and Lewigi typically utilize a "reverse search pattern," in which they begin at the driver's side headlight, move back along the driver's side of the car and around the trunk to the passenger's side taillight, then change direction and make a full clockwise circle of the car, and, finally, when back at the trunk, change direction again and search counterclockwise up the passenger side to the hood. During the first pass of an area, Deputy Skinner typically allows Lewigi to freely search,

without much direction from his handler; during subsequent passes, Deputy Skinner directs Lewigi to search certain areas. According to Deputy Skinner's testimony, when Lewigi shows noticeable odor responses, he typically also comes to final alert.

On February 8, 2017 Deputy Skinner stopped Walsh's vehicle for following a semi truck too closely. After making initial inquiries that aroused his suspicion that Walsh was involved in criminal activity, Deputy Skinner requested Walsh's consent to search her car. After Walsh refused to give consent, Deputy Skinner asked for Walsh's consent for his dog to do a free-air sniff of the car, and Walsh agreed.

Deputy Skinner retrieved Lewigi from his patrol car. Deputy Skinner and Lewigi began to search from the front driver's side toward the rear driver's side. When they rounded the car's trunk, Lewigi barked and jumped his front paws onto the trunk. Deputy Skinner testified that he interpreted both of these behaviors, in addition to Lewigi's continued attention on the trunk around the license plate area (instead of continuing with the search pattern), as responses to trained odors. Deputy Skinner put his hand on the car's trunk and said "back," and "search again." Lewigi continued to sniff around the license plate area. Deputy Skinner interpreted this as a detail search focused on the openings near the rear license plate and lights.

Deputy Skinner and Lewigi resumed searching in a clockwise direction around the car, and made their way to the passenger side. When they reached the trunk a second time, Lewigi jumped toward it again, similar to the first time. This time, Deputy Skinner noticed that Lewigi took shorter breaths, put his ears back, and again detailed the area around the

license plate.  Finally, Lewigi came to a near-sitting position.

At the same time that Lewigi was going into a sitting position, Deputy Skinner said something out loud.  Deputy Skinner testified at the hearing that he said "what?"  He explained that this remark was not a command to sit, and that Lewigi's command to sit is a two-syllable Dutch word that is pronounced "sit-ay."  Deputy Skinner admitted that it was a mistake to speak at the same time that Lewigi was signaling his final alert.  But he also testified that he had talked to Lewigi in a similar way during training exercises.  After Lewigi stopped and came near a sitting position, Deputy Skinner walked him around the front of Walsh's car again and returned him to his patrol car.

Defense expert Andy Falco Jimenez ("Jimenez") testified that Lewigi did not properly alert to Walsh's car in a way that would suggest probable cause.  Jimenez was a canine handler for the Anaheim, California police department for approximately seven years.  Jimenez has also trained law enforcement dogs and handlers, first in his law enforcement capacity and later through his own private company.  Jimenez has selected and initially trained between 100 and 200 police dogs and their handlers, and he has provided some form of training to thousands of detection dogs.  He has been licensed by the Drug Enforcement Administration and the Bureau of Alcohol, Tobacco and Firearms to possess narcotics and explosives for the purpose of training dogs, and has been a certifier of narcotics detection dogs for the state of California.

Jimenez testified that handlers may produce responses from a dog by consciously or subconsciously cuing the dog; that is, behaving in way that anticipates an event of interest

to the dog, such as by going to a cabinet where treats are kept. Jimenez opined that Lewigi's body language during the search, as shown in Deputy Skinner's dashboard camera footage (which was introduced in evidence), was not due to interest in the vehicle, but rather to cuing by Deputy Skinner's behavior. For example, Jimenez testified that when Lewigi "bracketed" back and forth on the trunk, he was following his handler's stopping and starting; and that when Lewigi sat, it was because he was nonverbally commanded to sit—that is, Deputy Skinner stopped and faced toward Lewigi, which was different from Deputy Skinner's body language during the balance of the search.

Jimenez also testified that a dog's physical "odor responses," such as tail wagging, changes in breathing, stopping in position, or raising its hair, are not limited to substances that the dog has been trained to detect, but rather could be caused by anything that interests the dog: a ball, food, a rodent, or urine from another dog, for example. And he opined that a dog would not turn his back on a car in which he smelled narcotics, but that Lewigi did turn his back on Walsh's car when Deputy Skinner and Lewigi changed directions during the first pass—suggesting that Lewigi was following his handler, not an odor. Jimenez also challenged the premise that a dog would lay his ears back when detecting a trained odor, because when his interest is aroused, a dog would instead be expected to raise his ears to enhance his hearing.

On cross-examination, Jimenez admitted that a dog's handler has the best vantage point to observe his dog's odor responses during a given search, but he also testified that his own training and years of experience put him in an effective position to interpret Lewigi's

behavior when seeing it on video.

After observing Lewigi's behavior during the free-air sniff, Deputy Skinner believed that he had probable cause to search the trunk of Walsh's car. During the ensuing search, he found clothing inside the trunk that smelled of marihuana. He also found counterfeit credit cards, debit cards, and identification documents. He did not find any drugs. Walsh was arrested.

Walsh moves to suppress the evidence seized following the search of the vehicle, and her statements. The government opposes the motion.

## II

The Fourth Amendment protects individuals against unreasonable searches and seizures. "The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). Evidence derived from an unreasonable search or seizure generally must be suppressed under the "fruit-of-the-poisonous-tree doctrine." *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015) (citing *United States v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013)). "Warrantless seizures are 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Id.* (quoting *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)). The automobile exception is one such exception.

"[W]arrantless searches of automobiles are permitted by the Fourth Amendment if supported by probable cause." *United States v. Seals*, 987 F.2d 1102, 1107 (5th Cir. 1993).

"[A]n alert by a drug-detecting dog provides probable cause to search" a vehicle. *United States v. Sanchez-Pena*, 336 F.3d 431, 444 (5th Cir. 2003). When a defendant challenges "the reliability of the dog overall or of a particular alert," then "[t]he question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 568 U.S. 237, 248 (2013).

Although "[a] defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional[,] . . . where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citations omitted).

### III

Walsh contends that Deputy Skinner did not have probable cause to search her car. She maintains that Lewigi's behavior and purported final alert resulted not from a trained reaction to the odor of drugs, but from handler cues. *See Harris*, 568 U.S. at 247. ("[E]ven assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not)[.]"). She posits that the odor responses that Deputy Skinner articulated were either normal dog behavior (such as sniffing or changed breathing) or resulted from cuing (such as bracketing on the trunk). And she maintains that cases in which probable cause was established by odor responses short of final alert are distinguishable because, in those cases,

environmental factors explained the dog's reluctance to come to final alert. *See United States v. Clayton*, 374 Fed. Appx. 497, 502 (5th Cir. 2010) (per curiam) (quoting testimony that dog's interest included area "underneath" vehicle); *United States v. Shen*, 2017 WL 2378289, at *4 (N.D. Tex. June 1, 2017) (Fitzwater, J.) (summarizing testimony that dog did not sit (which was dog's final alert) because dog did not like water, and there was water on the ground).

The government contends that Deputy Skinner had probable cause to search Walsh's car because Lewigi is reliable and was not improperly cued; that Lewigi had an excellent, well-documented performance record in the field and in controlled environments (which used single blind controls to make cuing impossible), *see Harris*, 568 U.S. at 246-47; that Deputy Skinner did not cue Lewigi, because Deputy Skinner credibly testified that he did not command Lewigi to sit; and that Deputy Skinner had probable cause to search the car even before Lewigi sat, because he articulated specific examples of Lewigi's other odor responses, such as barking, jumping, and detailing, *see Shen*, 2017 WL 2378289, at *9 (citing *Clayton*, 374 Fed. Appx. at 502).

IV

The government proved by a preponderance of the evidence that Lewigi's behavior was sufficient to establish probable cause to search Walsh's car. The government established that, viewed through the lens of common sense, Lewigi's odor response behaviors, in combination with Lewigi's and Deputy Skinner's training and experience, would have made a reasonably prudent person think that a search would reveal contraband or evidence of a

crime.  *See Harris*, 568 U.S. at 248.

Deputy Skinner and Lewigi had worked together for approximately three years at the time of the stop.  Lewigi was certified by both the National Narcotic Detector Dog Association and the National Police Canine Association.  Deputy Skinner and Lewigi completed periodic training every month, and completed annual certifications both before and after the stop.  Lewigi's annual certifications establish that he could reliably detect the odor of drugs in a controlled environment, where cuing was impossible because the handler did not know where drugs were present (known as single blind controls).  And Deputy Skinner and Lewigi's well-documented performance as a team in the field (75 of 84 alerts substantiated by finding narcotics) is reason to credit Deputy Skinner's interpretation of Lewigi's odor response behavior.

The court finds that Lewigi's odor response behavior was not based on handler cuing, because Deputy Skinner credibly testified that he did not give a command.  Although Walsh's expert, Jimenez, has significant expertise in training and working with drug detecting dogs, he is in a worse position than Deputy Skinner to evaluate Lewigi's behavior because he was not present during the stop, and can only form opinions based his viewing of the video recording.  In addition, Deputy Skinner has superior experience interpreting Lewigi's particular behaviors, and based on the team's record, his interpretations are reliable. *See Clayton*, 374 Fed. Appx. at 502.

The court also finds that Lewigi exhibited sufficient odor response to establish probable cause.  The video recording shows that Lewigi stopped and reached a near-sitting

position behind the car's trunk, which appears to be an imperfect version of his trained final response. And to the extent that this is not alone a clear signal, Deputy Skinner articulated other specific, reasonable examples of Lewigi's behavior that signaled the presence of drugs, such as barking, detail searching, and jumping toward the trunk. The Fifth Circuit in *Clayton* held that a "full alert" is not required to establish probable cause. *See id.* "So long as officers are able to articulate specific, reasonable examples of the dog's behavior that signaled the presence of illegal narcotics, this Court will not engage itself in the evaluation of whether that dog should have used alternative means to indicate the presence of the drugs." *Id*. Although *Clayton* is unpublished, it is nevertheless persuasive. And Walsh's attempt to distinguish *Clayton* lacks force, because the Fifth Circuit did not rely on the existence of an external explanation for the dog's failure to come to final alert. *See id.* Viewing all these facts through the lens of common sense, a reasonably prudent person would think that a search of Walsh's car would reveal contraband or evidence of a crime. *See Harris*, 568 U.S. at 248.

The court therefore holds that law enforcement officers had probable cause based on Lewigi's free-air sniff to search Walsh's vehicle.

\*   \*   \*

Accordingly, the court denies Walsh's motion to suppress.

**SO ORDERED**.

August 28, 2017.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE